[S. F. No. 5438. In Bank.—February 17, 1910.]

HENRY T. GRIEB, Suing for Himself and Others, Petitioners, v. J. H. ZEMANSKY, as Registrar of Voters of City and County of San Francisco, et al., Respondents.

PRIMARY ELECTION—REGISTRATION OF VOTERS—AUGUST PRIMARY.—The provisions of the existing primary law plainly indicate that the new registration of 1910 shall alone be used at the August primary election to nominate officers to be voted for at the general election in November of that year.

ID.—CONSTRUCTION OF PRIMARY LAW—PROVISO APPLICABLE TO MUNICIPAL ELECTIONS.—The proviso in such law that where a new registration is not completed in point of time sufficient to permit of its use, the registration of the last general election together with the supplementary registration, may be used, is intended to apply to primary elections held early in the year to nominate officers for municipal elections, and has no application to limit the August primary election.

ID.—NOMINATING PAPERS FOR AUGUST PRIMARY—REGISTRATION—MEM-
BERSHIP IN PARTY—MANDAMUS.—Only those who by registration in
1910 have declared their membership in a particular party may vote
at the August primary in that year; and only those can and should
be allowed to join in the selection of the candidates of that party.
*Mandamus* will not lie to compel the use of any other register to
qualify the signers of nominating papers for that primary.

PETITION for Writ of Mandate to the Registrar of Voters
and Board of Election Commissioners of the City and County
of San Francisco.

The facts are stated in the opinion of the court.

Lester G. Burnett, for Petitioners.

U. S. Webb, Attorney-General, and J. D. Fredericks, Dis-
trict Attorney of Los Angeles County, *Amici Curiæ.*

Thos. V. Cator and Hugh J. McIsaac, for Respondents.

HENSHAW, J.—The plantiff, for himself and all others
similarly situated, applies for a writ of mandate from this
court against the defendants, Zemansky, as the registrar of
voters, and the other defendants as members of the board of
election commissioners of the city and county of San Fran-
cisco, to compel them, when they come to examine the suffi-
ciency of "nomination papers" filed in behalf of candidates
proposed for nomination at the primary election in August,
1910, and in directing the manner of conducting said primary
election, to recognize and use the great register of voters reg-
istered in the years 1908 and 1909, and, as supplementary
thereto, the new great register which began to be made on
January 1, 1910.   In the return the defendants assert that
the new registration beginning January 1, 1910, is the only
one that can lawfully be used for the above mentioned pur-
poses.      .

The questions to be determined therefore are:   1. What
register shall be used at the primary election in August, 1910;
2. Who constitute the qualified electors authorized by law to
sign a candidate's nomination papers?

1. We are of the opinion that the provisions of the law
plainly indicate that the new registration of 1910 shall alone

be used at the August primary election.  The provisions of the law in this respect are as follows:—

"The qualifications and registration of voters and the privileges of electors to attend the polls at primary elections shall be subject to the same tests and governed by the same rules and regulations as are in the constitution and Political Code of this state established and prescribed for general elections; and the same officers who furnish the original affidavits of registration, indexes and supplements thereto, for general elections, as provided for in this code, shall furnish them for use at primary elections.  It shall be the duty of the proper officers to furnish the original affidavits of registration, indexes and supplements thereto, for use at primary elections, which shall show the names of all voters entitled to vote at such elections; provided, that where a new registration pursuant to law is not completed in point of time sufficient to permit of its use at the next ensuing primary election, then the original affidavits of registration and indexes used at the last general election in any county, or city and county, in this state, may be used at any primary election, together with the original affidavits of registration since the last election and supplemental indexes, showing all the additional registrations, changes, and corrections, made since the last general registration, completed to and including the twentieth day prior to the primary, which shall be the last day on which any person may register or transfer his registration, so as to entitle him to vote at such primary."  (Pol. Code, sec. 1366.)

Section 1094 of the Political Code provides that the new registration, beginning on January first of the even numbered years, "shall be in progress at all times except during the forty days immediately preceding any election, when it shall cease as to the electors residing in the territory in which such election is to be held."  It is contended that the new registration of 1910 "will not be completed in point of time sufficient to permit of its use" at the time of the primary election on August 16th, and, therefore, that under the proviso to section 1366 the old registration of 1908 and 1909 may be used.  We think the proviso in section 1366 was not intended to refer to the general August primary election to nominate candidates to be voted for at the November general election.

The proviso originated in the Primary ·Election Law of 1899 in which it was numbered as section 1375 of the Political Code (Stats. 1899, p. 54). This act provided for a primary election for delegates to conventions in cities to nominate city officers, in addition to the primaries for state and county conventions (Stats. 1899, p. 51). In 1901 a new primary law was enacted in which the proviso appeared as part of section 1366 (Stats. 1901, p. 614). That act was not made operative, except in certain cities (sec. 1372, Stats. 1901, p. 616). The present law provides for direct primaries and applies to all cities except those having a freeholders' charter covering the subject (secs. 1, 2, 3). In 1899; and ever since, the laws and charters governing city elections in many cities of the state provided for city elections to be held during the early months of the even-numbered years, at times when it was not to be expected that many persons would be registered under the new registration begun in January. City elections are to be held in cities of the second class on the second Monday of March (Municipal Corporation Act, sec. 301) ; in cities of the third class on the second Tuesday of March (sec. 502), and in cities of the sixth class on the second Monday of April (sec. 852). In San Jose under the city charter such elections are held on the third Monday of May (Stats. 1897, p. 596) ; in Santa Rosa on the first Tuesday of April (Stats. 1905, p. 870) ; and in Vallejo on the first Monday of March (Stats. 1899, p. 394). All of these are in the even-numbered years. None of these charters makes any provision for primary elections, nor does the General Municipal Corporation Act. Hence, in each of these cities, under section 5 of the present Primary Election Law, for party nominations primary elections must be held on the "Tuesday three weeks next preceding the city election." The General Municipal Corporation Law was enacted in 1883. (Stats. 1883, p. 93.) As will be seen, therefore, similar conditions existed in 1899 when this proviso was first enacted as a part of the primary law of that year. It was necessary to make some provision in that act permitting voters not newly registered to participate in such primaries, for it is apparent that if this were not done there would be few of the voters of such cities qualified to act in the choosing of candidates so soon after the new registration had begun. The proviso finds

its full justification in these conditions and to these only
was it intended to apply. If it were intended to apply to
the regular and general state and county primary election
to be held in the August preceding the general election, the
effect would be that the old registration would be used at
all primaries, except in a few cities where elections occur
in the odd-numbered years, or immediately after the November
election. The main object of the act was to provide for
the nomination of candidates for offices to be filled at the
general state and county elections in November. The holding
of such primaries for city officers, in the few cities where
elections were held so early in the even-numbered years was
incidental and of comparatively small importance. If it had
been intended that the old register should be used at the
general primary election, the one for which the law was really
enacted, it is scarcely conceivable that the legislature would
not have so declared in plain terms in the main body of the
section, leaving to the proviso the office of stating the con-
verse proposition that in the city elections occurring after
the November election and in the odd-numbered years, the
old register should not be used. The natural conclusion from
the language of the proviso to section 1366 and from the
whole act and the conditions to which it was addressed, is
that the regular August primary election for candidates for
state and county offices was not considered an exceptional
case to be met by a proviso, that the registration which at
that time has been in progress for nearly seven months was
considered as sufficiently complete for use, and that the pro-
viso was intended to apply only in the cities having local
elections earlier than the general August primary election.

This conclusion is strengthened by the fact that it gives
ample time for any voter to register and qualify himself to
vote at the August primary. Its necessity is also shown by
the provisions of section 1366a of the Political Code referred
to in sections 16 and 17 of the act. Section 1366a requires
every voter when he registers, to declare in his affidavit the
name of the political party with which he desires to affiliate
at ensuing primary elections, and provides that no person
shall be entitled to vote at a primary election unless he has
so declared. This section was enacted in 1907, and, until
the enactment of the present law, it was in force only in cer-

tain cities mentioned in section 1372, added to the Political Code in 1901. Hence persons residing outside of those cities, who registered in 1908 and 1909, were not usually required to declare their party affiliation. Section 16 of this act provides that the right of a voter at a primary election to vote the party ticket of the party with which he has declared his affiliation, as provided in section 1366a, shall not be challenged or subjected to any test, if he is otherwise qualified as a voter. Section 17 provides that an elector who has twenty days before a primary election "qualified by registration and by declaration of the political party with which he intends to affiliate, as provided in section thirteen hundred and sixty-six a of the Political Code, shall be entitled to vote at such primary election, such right to vote being subject to challenge only as hereinbefore provided; and shall, on writing his name or having it written for him on the roster, . . . receive the official primary election ballot of the political party designated in his affidavit of registration, and no other." If the old registration should be allowed in use at the regular August election of the present year, these provisions could not be followed in any part of the state, except in the cities aforesaid, for the registration affidavits outside of those cities would not show any declaration of party affiliation and the voter would not by the letter of the law be entitled to receive any ballot. The law would not operate uniformly this year. By limiting the application of the proviso in section 1366 to the cities where elections are to be held prior to August in the even-numbered years, all difficulty is removed, the legislative purpose will be carried out and the law made harmonious. The defendants are correct in their assertion that the registration of 1910 is constituted the test by which to determine the right to vote at the next August primary election, and that no other registration is to be used on the polls at that day.

2. From the conclusion above reached and expressed there follows necessarily the determination that only those electors whose names appear upon the register of 1910 can join in the nomination paper of a candidate who is to be voted for at the August primary. The reasons compelling this conclusion are two. First, the law contemplates and declares that the signers shall be "qualified electors." They must make affi-

davit to such effect. This cannot mean that they were quali-
fied electors in the past—one year, two years or five years
ago. It must, and can mean only, that they are electors quali-
fied to participate in the election in contemplation of which
they are signing a candidate's nomination paper. But, as
admittedly only those electors who had registered in 1910
can vote at this primary, it must follow that only such are
qualified to sign a candidate's paper.

The second reason is this. Throughout the primary law
it is repeatedly declared that a candidate seeking the nomina-
tion of a political party must accompany his petition by a
percentage of the qualified electors *of that party.* If, then,
a candidate seeks the Republican or Democratic nomination
in August, 1910, his candidacy must receive the indorsement
of a sufficient number of the electors of that party. Who
at the primary election of 1910 are the qualified electors of
the Republican, the Democratic, or any other political party?
The answer is evident. Only those who upon the register
of 1910 (and not upon the register of any preceding year)
have declared their affiliation with such party. The law ex-
tends the fullest permission to an elector in registering to
change his political party. If the register of preceding years
may be used in behalf of a candidate in the August primary
of 1910, it will follow that men who appear upon the registra-
tion of 1909 as Republicans and who have registered in 1910
as Democrats will have aided in putting before the people the
candidate of a party to which they do not belong. Indeed,
it is conceivable that under such circumstances, by changes
in registration, if the use of old registers is permitted, a can-
didate might go before the electors seeking the suffrages of
a political party without having the indorsement of any-
where near the number of names of qualified electors of his
party as required by law. The language of the statute pre-
sents no difficulties of interpretation. Only those who by
registration have declared their membership in a party may
vote at the primary election, and only those can and should
be allowed to join in the selection of the candidates of that
party.

The argument *ab inconveniente* may be employed in the
construction of a doubtful statute, but it has no force in the
interpretation of a statute like this whose terms are not

doubtful. But even if they were, in the present instance the
argument in favor of the use of old registers is entitled to
little weight. On the part of the candidates it may be said
that it is not in contemplation that they will be able to per-
form personally the labor of obtaining signatures to their
nomination papers throughout the various counties of the
state. In view of this the law itself permits the candidate
to appoint "verification deputies" to obtain signatures to their
nomination papers. It is not easy to see that any greater
labor or any greater expense is cast upon the candidate in
that he is required to direct deputies to obtain signatures
from the registration of 1910 rather than from the registra-
tion of some preceding year or years. But considering the
public officers, the weight of the argument *ab inconveniente*
is quite on their side. The time allowed them for the inspec-
tion of candidates' papers is extremely short, only ten days.
It will greatly increase the burden cast upon them if in veri-
fying the competency of the electors' names they shall have
to resort to the old registration instead of the new. Indeed,
as advised in the argument of this case, of the 90,000 electors
upon the great register of San Francisco for the year 1909,
only 35,000 are qualified at the present time to vote at the
place of registration. Moreover, no reasonable fear may be
entertained that the time allowed for the new registration
may prove insufficient for obtaining the signatures of an ade-
quate number of a party's following. Under the earlier law
seventy-five days was considered sufficient time to complete
a new registration (Stats. 1895, p. 228; Pol. Code, sec. 1094).
Now the registration begins upon the first day of January
in each even-numbered year "and is in progress at all times
except during the forty days immediately preceding any
election." There are thus about six months allowed for this
registration before the date of the primary.

It will freely be conceded by the court that this primary
law is both complex and onerous, but we are advised that it
was adopted in response to a very general popular demand.
This being so, it is but fair to assume that the vast majority
of the electors who find in this law a panacea for all political
ills will flock to the registration booths and qualify them-
selves to take part in the important primary elections which
follow.

For the foregoing reasons the application for mandate is denied.

Beatty, C. J., and Lorigan, J., concurred.

ANGELLOTTI, J., concurring.—I concur in all that is said in subdivision one of the foregoing opinion. It appears to me to necessarily follow therefrom that the conclusion reached upon the second proposition discussed in the opinion is correct. It may be conceded that the requirement of the primary law as to the number of signatures to nomination papers is unnecessarily onerous, but that is, of course, a matter wholly within the control of the legislature. To my mind the law enacted by the legislature clearly contemplates that only those qualified to participate at the primary election may participate in the nomination of candidates to be voted for thereat. I therefore concur in the judgment.

SHAW, J., concurring.—I concur in all that is said in subdivision numbered one of the opinion of Justice Henshaw. I dissent from that part of the opinion embraced in subdivision two thereof.

Justices Sloss and Melvin do not participate in the determination of this matter.

Rehearing denied.